<table>
<tr><td colspan="2"><strong>IN THE UNITED STATES DISTRICT COURT<br>FOR THE SOUTHERN DISTRICT OF OHIO<br>WESTERN DIVISION AT CINCINNATI</strong></td></tr>
<tr><td>THE KROGER CO., et al.,<br><br>        Plaintiffs,<br><br>vs.<br><br>EXCENTUS CORPORATION,<br><br>        Defendant.</td><td>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br><br>JUDGE SANDRA S. BECKWITH<br><br>CIVIL ACTION NO. 1:10-cv-00161-SSB<br><br><strong><u>PLAINTIFFS' AMENDED OPENING<br>CLAIM CONSTRUCTION BRIEF</u></strong></td></tr>
</table>

## I.  CLAIM CONSTRUCTION PROCEDURE

Claim construction begins and ends in all cases with the actual words of the claims. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).  The words of the claims must be based on the written description in the patent specification.  *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)  The specification, therefore, is "the single best guide to the meaning of a disputed term."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Philips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*).  The patent's prosecution history should also be considered, however, because "the prosecution history can often inform the meaning of claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Philips*, 415 F.3d at 1317.

## II.  OVERVIEW OF U.S. PATENT NO. 6,321,984 ("the '984 patent")

Under the heading "SUMMARY OF THE INVENTION," the '984 patent describes a data processing system that will "track the customer purchases and compare them with a

predefined criteria to determine when a fuel discount is to be provided." ['984 Patent, Doc# 45-2, col 2, ln 26-36]. When the customer's purchasing activity meets a predefined purchasing criteria, achievement of the criteria is recorded and the reward system authorizes a fuel discount and provides the customer with a mechanism to obtain the discounted fuel, such as a bar coded receipt or an identification code. [*Id*. at col 2, ln 37-46]. The customer may then scan the receipt or enter the identification code at the pump. [*Id*. at col 2, ln 47-50]. Before dispensing fuel, the pump controller adjusts the price-per-unit on the pump display by subtracting the awarded price-per-unit discount from the original price-per-unit. [*Id*. at col 2, ln 50-57].

## III.   DISPUTED CLAIM LANGUAGE OF THE '984 PATENT

### 1.   a record associated with purchases made by the user, the record including the users achievement of a purchasing criteria

This limitation from claims 1 and 14 of the '984 patent needs to be construed because it details a particular database record structure that a system must use to infringe the claims. It is not sufficient for a database to include just any record associated with purchases made by the user. The record must include "the users achievement of a purchasing criteria," consistent with the exemplary customer record that is shown and described in the specification of the '984 patent. Kroger contends that the disputed claim language means "**a record associated with fuel or non-fuel purchases made by the user, the record including a determination that the user is entitled to a discounted unit price based on a comparison of the user's purchases to predefined purchasing criteria**."

The system described by the '984 patent as the "invention" determines whether a user is entitled to a fuel discount by comparing the customer's purchases with predefined criteria. [*Id*. at col 2, ln 20-67; col 3, ln 31-33; col 10, ln 53-59]. *See American Piledriving Equip., Inc. v. Geoquip, Inc*., 637 F.3d 1324, 1334 (Fed. Cir. 2011) ("[A] statement in a specification that

describes the invention as a whole can support a limiting construction of a claim term.").  If the purchasing criteria has been achieved, then the reward system authorizes a fuel discount and the outcome of the determination that the user is entitled to a fuel discount is recorded in the customer's record.

Fig. 9 of the '984 patent (reproduced below with comments added) shows "an example of a record that could be used to track customer eligibility for fuel discount rewards in accordance with the present invention."  [*Id*. at col 3, ln 28-30].  In fact, this is the only example of a customer record that the '984 patent shows.  Field 310 of the customer record in Fig. 9 includes "data representing the availability of a fuel discount."  [*Id*. at col 9, ln 45-46].  Thus, the record includes a field having a positive indication that a determination has been made that the customer is entitled to a fuel discount reward based on a comparison of the customer's purchases to predefined purchasing criteria.



*Fig. 9*

3

The '984 patent also describes a particular customer's purchasing history with reference to Fig. 9, stating:

> [O]n Jan. 17, 1999, A. Smith purchased five designated items, 10 total items for $15.00. This purchase will cause the total designated item purchase by this customer to exceed five and cause a fuel discount to be offered. *Thus, field 310 will indicate that a fuel discount was offered to A. Smith on Jan. 17, 1999.* The discount amount is noted as $0.10 per gallon in field 314. As noted above, the mechanism by which the discount is offered may be a receipt with a bar code, updated magnetic card, alphanumeric authorization code, or the like.
>
> ….
>
> On Feb. 4, 1999, A. Smith once again purchases items from this, or another participating store. This purchase causes the total purchases to exceed $100.00. Also, A. Smith purchased three total items that caused the total quantity of merchandise purchased at this store to be greater than 20 items. In this example, exceeding both of these criteria will trigger a fuel discount. That is, purchasing greater than 20 items within a month will cause a $0.10 fuel discount to be offered and exceeding $100.00 in total purchase price will cause a $0.15 fuel discount. Those skilled in the art will understand that the fuel discount system of the present invention can be designed to offer the highest discount of the two, e.g. $0.15 per gallon, the lowest discount $0.10, an average of the two, or add the discounts and offer a $0.25 per gallon discount to the customer. In any event, *it can be seen that information provided in record 208 can be used to monitor a customers status relative to being offered discounted fuel and to determine when such offer is to be made to the customer.*

[*Id*. at col 9, ln 52 – col 10, ln 31 (emphasis added)].  Thus, Fig. 9 and the corresponding description disclose a process in which (1) the customer's purchases are compared to predefined purchasing criteria, and (2) if the purchases satisfy the criteria, then the customer's entitlement to a discount is recorded in the record of the customer's purchases.  The description explicitly states that the data in the record can be used to "monitor a customers status relative to being offered discounted fuel." [*Id*. at col 10, ln 29-30].

The disputed claim language does not merely require "a record associated with purchases made by the user" from which achievement of a purchasing criteria *can be determined*.  The claim language expressly requires that the record include "**the users achievement of a**

4

**purchasing criteria**." This additional claim language is presumed to have meaning and should not be construed in a manner that would render it superfluous. *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007). The "achievement" of a criteria that qualifies the customer for a discount cannot be recorded as an historical fact in a "record" unless a determination has first been made that the user satisfied (i.e., achieved) the predefined criteria.

## IV.  OVERVIEW OF U.S. PATENT NO. 6,332,128 ("the '128 patent")

The '128 patent is directed to a system and method for providing a product-specific, price-per-unit discount on fuel in response to the purchase of a predetermined product that is being cross-marketed. For example, if a customer buys a two liter bottle of Coke, the customer may receive a two cents per gallon discount on fuel. In addition, the '128 patent discloses that the customer may earn multiple price-per-unit discounts for the purchase of multiple products in the same or different store visits, all of which can be added together for a total price-per-unit discount on fuel. So, if a customer also purchases a bottle of Tide detergent, the customer may receive a three cents per gallon discount on fuel, which is added to the two cents per gallon discount associated with Coke for a five cents per gallon total discount. Once the customer purchases gasoline, the total value of the discount redeemed is determined and can then be allocated to the vendors (i.e., manufacturers) of the individual cross-marketed products, the purchase of which resulted in the fuel discount. ['128 Patent, Doc# 45-4, Abstract].

## V.  DISPUTED CLAIM LANGUAGE OF THE '128 PATENT

### 1.    awarding a second discount on the PPU of the consumable good to the customer in response to a purchase by the customer of a second cross-marketed product

Independent claim 1 of the '128 patent recites the steps of: (1) "awarding a first discount on the PPU of the consumable good to the customer in response to a purchase by the customer of

a first cross-marketed product;" (2) "awarding a second discount on the PPU of the consumable good to the customer in response to a purchase by the customer of a second cross marketed product;" and (3) "adding the first discount to the second discount to determine a total discount on the PPU of the consumable good." [*Id*. at col 8, ln 62 – col 9, ln 3].  The disputed claim language identified by the parties for construction was amended during prosecution in order to distinguish the claimed invention over cited art and therefore requires a construction that is consistent with the basis for the asserted distinction.

The parties dispute the meaning and scope of the claim language in at least two important respects.  First, the parties dispute what it means to award a discount "in response to a purchase by the customer of a … cross-marketed product."  Kroger contends that the awarded discount must be product-specific (i.e., given in exchange for the purchase of a predetermined product that is being marketed).  Second, the parties dispute the meaning of a "discount on the PPU of the consumable good."  Kroger contends that a discount on the PPU is a reduction in a specified monetary amount on the price per unit of the consumable good – not merely a representation of an unspecified reduction as Excentus contends.  Accordingly, Kroger contends that the disputed claim language means "**awarding a second product-specific reduction in a specified monetary amount on the price per unit of the consumable good to the customer in exchange for a purchase by the customer of a second predetermined product being marketed**."

> a.    *The discount is a product-specific discount awarded in exchange for the purchase of a predetermined product*

The written description of the '128 patent, which is the best indicator of what the inventor actually invented, first states:

It would be desirable to gasoline vendors to have a method which would allow the application of varying discounts to the price per gallon based on the number of cross-marketed products purchased. For example, if the gasoline vendor had a cross-marketing agreement with various vendors of products sold by a HVR merchant, the purchase of Product A could result in a discount in the price of the gasoline of $0.02 per gallon. Likewise, the purchase of Product B could result in a discount in the price of the gasoline of $0.02 per gallon. If the consumer buys both products, it would be desirable to discount the price of the gasoline by $0.04 per gallon. Existing systems and methods do not perform this function.

....

… In order to overcome the disadvantage of existing solutions, it would be advantageous to have a method … which allows the application of multiple level discounts to the price per gallon of gasoline based on the number of cross-marketed products purchased. *The present invention provides such a method*.

[*Id*. at col 1, ln 57 – col 2, ln 5, 30-37 (emphasis added)].  Under the heading DETAILED

DESCRIPTION, the specification further states:

*The present invention is* a method of utilizing electronic coupons for cross-marketing. By making a purchase of one or more products, a customer earns discount credits toward the purchase of another product such as gasoline. For example, if the customer buys Product A from a HVR merchant such as a grocery store or convenience store, she may earn a Price Per Unit (PPU) discount of $0.02/gallon on her next purchase of gasoline at a participating gas station....

The PPU price on the gasoline dispenser can be discounted to multiple levels, depending on the discount which the customer has earned. For example, if the customer also bought Product B which provides a gasoline discount of $0.02/gallon, in addition to Product A, then the system automatically adds the two discounts together to calculate a total discount. Thus, when the customer scans in her receipt and purchases gasoline, she receives a PPU discount of $0.04/gallon.

[*Id*. at col 3, ln 55 – col 4, ln 14 (emphasis added)].  Because the discounts are product-specific,

the specification suggest that it is possible to "determine the effectiveness of cross-marketing

agreements on various products" by analyzing data from the discounts issued and discounts

redeemed.  [*Id*. at col 6, ln 57-61].

Fig. 1 of the '128 patent is described as illustrating "the present invention." [*Id*. at col 5,

ln 14-66].  With respect to Fig. 1, the written description states: "When a customer purchases

items from the HVR merchant, the HVR POS terminal 11 determines at 21 which purchases qualify for a price-per-unit (PPU) discount on gasoline.  A total PPU discount is then calculated by adding each individual PPU discount for which the customer has qualified." [*Id*. at col 5, ln 14-26].  At the conclusion of a purchase transaction the POS terminal may print a receipt that is treated as a legal tender coupon.  [*Id*. at col 5, ln 32-36, col 3, ln 58-67].  The customer may scan more than one receipt at the fuel dispenser and the price per unit discount associated with each receipt is added to the total PPU discount.  [*Id*. at col 6, ln 33-36].

Each of these descriptions from the '128 patent makes it clear that the process described as "the invention" evaluates the identity of each product purchased by the customer and awards a product-specific price per unit discount for each product identified as a predetermined cross-marketed product.[1]  The purchase of just a single product results in the award of a discount if the product is identified as a predetermined cross-marketed product.

This interpretation is consistent with positions taken by the applicant in the prosecution history.  During prosecution of the '128 patent application, the Examiner rejected pending claim 1 over prior art U.S. Patent No. 5,173,851 to Off ("Off").  Off generally discloses a system in which the printing of a discount coupon is conditioned on the purchase of multiple triggering products that may not be related in any way.  In response to the rejection, the applicant argued:

> Off teaches that the customer will receive a discount on a particular product *if and only if* the customer purchases at least two independent cross-marketed products.  Thus, Off teaches that *no* discount is awarded unless *both* cross-marketed products are purchased.  This teaches away from the Applicant's claimed invention.

---

[1] The '128 patent distinguishes between product-specific discounts and discounts that "are not product-specific," such as a ten cents per gallon discount for purchasing one hundred dollars of groceries in a single visit. ['128 Patent, Doc# 45-4, col 4, ln 15-25].  These non product-specific discounts are not the subject of the disputed claim language.

['128 Prosecution History, Doc# 45-7, PageID# 1654 (emphasis in original)]. These comments confirm Kroger's understanding that the claimed invention awards a product-specific discount in exchange for the purchase of a single predetermined product that is being marketed.[2]

In order to more explicitly express this distinction over the Off reference, the applicant later amended the relevant claim language from awarding a first discount "based on" the purchase of a first cross-marketed product to awarding a first discount "in response to" the purchase of a first cross-marketed product. ['128 Prosecution History, Doc# 45-7, PageID# 1699]. In contemporaneous remarks the applicant stated: "An … amendment has been made to recite that each discount is awarded *in response to* (rather than "based on") a purchase by the customer of a first cross-marketed product. Applicant feels this is a more precise recitation of his method." ['128 Prosecution History, Doc# 45-7, PageID# 1707-08 (emphasis in original)]. Kroger believes that the amended claim language "in response to" is narrower than the original language "based on." Kroger further believes that awarding a discount "in response to" the purchase of "a first cross-marketed product [(singular)]" means that there is a one to one correspondence between the purchase and the award. That is, the award of the first discount is made in exchange for the purchase of the first cross-marketed product, not for some other reason.

   b. *The discount on the PPU is a reduction in a specified monetary amount*

As the phrase is used consistently throughout the written description of the '128 patent, a "discount on the PPU" (also referred to as a "PPU discount") is a reduction in a specified monetary amount on the price per unit (e.g., ten cents off per gallon). *See Bell Atl. Network Servs., Inc. v. Covad Communications Grp., Inc*., 262 F.3d 1258, 1268, 1271 (Fed. Cir. 2001) ("[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner

---

[2] Kroger also notes that the applicant referred interchangeably to cross-marketed products and "triggering products" during prosecution. ['128 Prosecution History, Doc# 45-7, PageID# 1653 ("[I]t is impossible for the two triggering (cross-marketed) products to have come from different merchants.")].

consistent with only a single meaning, he has defined that term 'by implication.'"). In column 3 the '128 patent refers to "a Price Per Unit (PPU) discount of $0.02/gallon." ['128 Patent, Doc# 45-4, col 3, ln 61]. Likewise, in column 4 the '128 patent refers to "a PPU discount of $0.04/gallon." [*Id.* at col 4, ln 13-14]. With reference to Fig. 2, the '128 patent states that field 5 "shows the PPU discount issued in cents per fuel-unit volume (for example, 0.15/gallon)." [*Id.* at col 5, ln 57-59].

Even more importantly, the '128 patent also describes using a "PPU discount" in a manner in which it can only be a reduction in a specified monetary amount – not merely a representation of an unspecified reduction. For example, the specification of the '128 patent describes "subtracting the total PPU discount from the normal price" to determine the adjusted price per unit for displaying on a fuel dispenser. [*Id.* at col 6, ln 28-39; col 7, ln 21-26]. In addition, the specification states that "the value of the discount redeemed is determined by multiplying the PPU discount by the number of gallons purchased." [*Id.* at col 8, ln 5-7]. In each case, the PPU discount must be a reduction in a specified monetary amount (e.g., 20 cents off per gallon) to carry out the described arithmetic operation.

If, as Excentus contends, the PPU discount was merely a representation of a reduction, such as reduction representation "A," then the above-described arithmetic operations would not make sense. For example, a posted price of $3.00/gallon minus reduction representation A does not produce a new adjusted price per gallon. Similarly, the value of a redeemed discount cannot be determined, as described in the '128 patent, by multiplying reduction representation A by the number of gallons purchased.

Nor is the claimed "discount on the PPU" an amount of reward points. For example, if a customer is awarded 10 points for a first purchase and 25 points for a second purchase for a total

of 35 points, an adjusted price per unit of fuel cannot be calculated, as described in the '128

patent, by subtracting 35 points from the normal price.  Nor can the value of any discount

redeemed be determined by multiplying 35 points by the number of gallons purchased.

Furthermore, construing "discount on the PPU" in a manner that would enable the patentee to

argue that the term encompasses reward points would also be inconsistent with other uses of that

phrase by Excentus and the inventor of the '128 patent, Randy Nicholson.

Nicholson is also identified as a co-inventor of U.S. Patent No. 7,742,942, which is also

assigned to Excentus and which is addressed below.  That patent teaches that reward points are

"exchanged for," "redeemed for," or "converted to" a PPU discount on fuel.  ['942 Patent, Doc#

45-11, PageID# 1994, col 6, ln 1-18].  Thus, reward points are not a PPU discount.  Common

sense suggests that common language in patents with common inventors, common subject

matter, and common assignees is used consistently.   The use of the disputed claim language in

the '942 patent confirms the construction already determined independently from the '128 patent.

Points are not a price per unit discount.  A discount on the price per unit is a reduction in a

specified monetary amount on the price per unit.

### 2.    discount

When considered in context, and for the reasons stated above, Kroger contends that the

claim term "discount" means "**reduction in a specified monetary amount**."

## VI.  OVERVIEW OF U.S. PATENT NO. 7,383,204 ("the '204 patent")

The '204 patent is related to the previously described '984 patent through a family of

continuation, continuation-in-part, and divisional applications.  While other patents within the

family are directed to price-per-unit discount rewards, the '204 patent is directed to a distinct

embodiment, described in Example B of the '204 patent, in which the customer receives free fuel

11

rewards that are added together to provide the customer with a total free fuel reward.  ['204

Patent, Doc# 45-9, col 6, ln 51 – col 7, ln 2].

## VII.  DISPUTED CLAIM LANGUAGE OF THE '204 PATENT

The fundamental dispute between the parties relates to the meaning of "free fuel."

Kroger believes common sense dictates that free fuel must be provided at no charge, not merely

at a reduced unit price.

> **1.     dispensing an amount of free fuel to the customer equal to the total of the
> first and second amounts of free fuel**

The disputed claim language is recited in claim 1 of the '204 patent.  The written

description of the '204 patent provides clear examples that distinguish between free fuel and fuel

sold at a reduced price per unit.  In Example B, the '204 patent describes "a reward program that

gives free gasoline" by means of bar coded receipts indicating "a free $1 worth of gasoline."  [*Id.*

at col 6, ln 51-64].  If the customer wants to dispense additional gasoline beyond the amount of

free fuel awarded, the customer must also insert a credit card for payment.  [*Id.* at col 6, ln 65-

67].

By contrast, in Example C, the '204 patent describes providing a customer with a ten cent

per gallon discount for use of a membership card.  [*Id.* at col 7, ln 3-12].  When the customer

dispenses fuel, the customer's account is credited for the purchase adjusted by the ten cent per

gallon discount.  [*Id.* at col 7, ln 15-17].

The difference between free fuel and fuel provided at a reduced price per unit is that the

customer can receive free fuel without incurring any charge at all.  A free fuel reward enables the

customer to dispense an amount of fuel at no cost and with no further obligation to the fuel

merchant.  Fuel sold at a reduced price per unit, however, always has some cost associated with

it, no matter how small the volume of fuel dispensed.  In other words, a total price per unit

discount less than the posted price per unit of fuel does not result in free fuel; the customer must still pay some amount of money for any fuel that is dispensed.

Example B is the only embodiment in the specification of the '204 patent in which free fuel rewards are added together.  With respect to Example B the specification states:

> 2. The store, which has a reward program that gives free gasoline, gives the customer a receipt … having bar coded data … indicating a free $1 worth of gasoline.
>
> 3. The customer collects four more receipts over several visits to the store, each indicating a free $1 worth of gasoline.
>
> 4. The customer sequentially places the five receipts in front of the scanning bar code reader [], and then operates the fuel dispenser [] to dispense $5 worth of gas.

['204 Patent, Doc# 45-9, col 6, ln 55-64].  Thus, the customer dispenses, at no charge, an amount of fuel equal to the sum of the previously awarded free fuel amounts.

Kroger contends that the disputed claim language means "**dispensing at no charge to the customer, rather than at a reduced unit price, a total amount of fuel equal to the sum of the first and second amounts previously awarded to the customer**."

**2.      dispensing an amount of free fuel**

For the reasons previously stated above, Kroger believes that the disputed claim language means, "**dispensing at no charge to the customer, rather than at a reduced unit price, an amount of fuel**."

**3.      means for providing the customer with a first reward entitling the customer to a first amount of free fuel in exchange for purchasing the non-fuel products or services in the first visit, and for providing the customer with a second reward entitling the customer to a second amount of free fuel in exchange for purchasing the non-fuel products or services in the second visit**

This claim limitation appears in claim 7 and is drafted in means-plus-function format.

*See* 35 U.S.C. § 112 ¶ 6 (2006).  Kroger contends that, taking into consideration the other

language in claim 7, this limitation means "**means for providing to the customer, upon detection that the customer purchased the predefined threshold quantity of non-fuel products or services during the first store visit, a first reward entitling the customer to receive a first defined amount of fuel at no charge to the customer, rather than at a reduced unit price, and for providing to the customer, upon detection that the customer purchased the predefined threshold quantity of non-fuel product or services during the second store visit, a second reward entitling the customer to receive a second defined amount of fuel at no charge to the customer, rather than at a reduced unit price**."

Kroger also contends that the limitation is indefinite and invalid because the specification of the '204 patent fails to clearly link the claimed function to a particular structure that performs the function. *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003); *Biomedino, LLC v. Waters Tech. Corp.*, 490 F.3d 946, 949-50 (Fed. Cir. 2007).

Without attempting to construe the stated function, Excentus contends that the corresponding structure is a computing center, computer, or server. [Substitute Joint Claim Construction Chart, Doc# 48-1, pg 16]. A general purpose computer or server, however, would not perform the recited function unless specially programmed. The specification does not describe the specific algorithm to be performed. It is also unclear how a general purpose computer or server could, alone, perform the stated function of "providing" the customer with a "first reward" and a "second reward." Is a receipt printer also required? A magnetic encoder? A rewards issued database?

The specification is not clear as to the structure that the patentee intends to correspond to the claimed function.. The claim, therefore, is invalid for indefiniteness. *Biomedino*, 490 F.3d 946 (Fed. Cir. 2007).

## VIII.  OVERVIEW OF U.S. PATENT NO. 7,742,942 ("the '942 patent")

The '942 patent describes a system and method of discounting the price-per-unit of fuel during a fuel transaction by an amount that depends on the identity of the bank that issued the customer's payment card.  ['942 Patent, Doc# 45-11, col 4, ln 26-31].  As succinctly summarized by the Patent Examiner during prosecution of the '942 patent, the '942 patent is directed to a "process for identifying a card issuer and associating the card issuer with a PPU discount for fuel given to a card bearer/user." ['942 Prosection History, Doc# 45-15, PageID # 2434]. Importantly, the applicant made very clear during prosecution that the claimed invention involves multiple card issuers and that the different card issuers are associated with different price-per-unit discounts negotiated between each issuer and the fuel merchant.  ['942 Prosecution History, Doc# 45-14, PageID# 2350; Doc# 45-12, PageID# 2112-13, 2067, 2050].  Customers, therefore, receive different price-per-unit discounts based upon which issuer's card they choose to use for payment.  [*Id*.].

## IX.  DISPUTED CLAIM LANGUAGE OF THE '942 PATENT

The preambles of claims 1 and 9 contain claim language that is disputed by the parties. Whether a preamble of a claim is a limitation on the scope of the claim must be determined based on a review of the entire patent and its prosecution history to understand what the inventors actually invented and intended to encompass by the claim.  *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).  A preamble limits the invention if it is necessary to give life, meaning, and vitality to the claim.  *Catalina Mktg. Int'l, Inc., v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).  "Moreover, clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the

preamble to define, in part, the claimed invention." *Id.* (citing *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001)); *see also Storage Tech. Corp. v. Cisco Sys. Inc.*, 329 F.3d 823, 835 (Fed. Cir. 2003).

During prosecution of the '942 patent, the applicant amended the preambles of both independent claims 1 and 9, and argued for patentability over the cited prior art based on those preamble amendments.  The preambles, and the applicant's arguments relating thereto,  thus became limitations on the scope of the claims upon which Kroger is entitled to rely.

### 1. increasing customer use of third-party financial cards issued by a plurality of third-party issuers

The basic concept of the '942 patent is that a card issuer may enter into an affinity-type agreement with a fuel merchant to increase customer use of the issuer's financial card by awarding price-per-unit discounts on fuel purchased with the card.  ['942 Patent, Doc# 45-11, col 3, ln 52-60].  The specification of the '942 patent suggests that "[t]he retail fuel merchant *may* have affinity-type relationships with multiple card issuers, and each relationship *may* specify a different PPU discount level."  [Id. at col 4, ln 44-46 (emphasis added)].  However, during prosecution of the '942 patent the claims defining the protected invention were amended to *require* multiple card issuers.  Kroger, therefore, contends that the disputed claim language means "**increasing use of multiple, different payment cards issued to customers by multiple, different issuers that are unrelated to the fuel merchant**."

The claim language at issue appears in the preamble of claim 1 of the '942 patent.  As originally filed, the preamble of independent claim 1 lacked any recitation of multiple card issuers.  ['942 Prosecution History, Doc# 45-15, PageID# 2463].  In a first Office action, the Patent Examiner rejected original claim 1 based on a 1997 prior art article to Hisey that described awarding an automatic price-per-unit discount on fuel in response to the use of a single

private label credit card.  ['942 Prosecution History, Doc# 45-15, PageID# 2434-2435].  To overcome the Examiner's rejection, the applicant amended claim 1 to require that the claimed card entitling the customer to a discount must be issued by a "third-party issuer."  ['942 Prosecution History, Doc#45-15, PageID# 2424, 2428].  The amended preamble still did not refer to multiple card issuers.

Despite the applicant's claim amendment, the Examiner persisted with the rejection of claim 1 in view of the prior art.  The applicant responded with the following argument for patentability:

> The Examiner does cite the Hisey article in which a gas merchant, in cooperation with a private credit card, instantly rolls back the price per gallon when the consumer uses the private card at the pump.  However, the fact that the price of a gallon (liter in the reference) rolls back when a particular card is used does not support the claim limitation that the discount **magnitude** is dependent upon the identity of the card issuer.  Nothing in the cited prior art even hints that the magnitude of the discount (roll-back) is dependent upon which card is used.  The fact that the magnitude is dependent on the card issuer means that different cards yield different magnitudes of gas discounts.  The prior art simply does not address this limitation.  Accordingly, independent claims 1 and 11 should be held allowable.

['942 Prosecution History, Doc# 45-14, PageID# 2350].

In a subsequent Office action, the Examiner acknowledged the applicant's arguments by stating that "the Applicant argues that independent claims 1 and 11 recite that 'the discount **magnitude** is dependent upon the identity of the card issuer'."  ['942 Prosecution History, Doc# 45-13, PageID# 2122].  The Examiner rejected the arguments, however, because "it should be noted that the claims do not contain such explicit language."  [*Id.*].

The applicant responded by further amending the preamble of claim 1 as follows:

> A computer-implemented method of discounting a price-per-unit (PPU) of fuel at a fuel merchant and increasing customer use of [[a]] third-party financial ~~card~~ cards issued by a plurality of third-party ~~issuer~~ issuers, wherein the third-party

17

financial ~~card is~~ <u>cards are</u> selected from a group consisting of credit cards and debit cards, said method comprising:

['942 Prosecution History, Doc# 45-12, PageID# 2108].   In addition, the applicant contemporaneously argued:

> Claims 1 and 11 have been amended to make it perfectly clear that there can be multiple credit card issuers and each issuer can have an independent PPU discount…. Thus, as amended, all of the claims now recite more clearly that the amount of a discount that a customer receives for fuel is dependent upon the issuer of a credit facility.  Accordingly, all customers of the merchant are not treated equally with respect to the amount of discount a customer will receive for fuel purchases.  The actual value of the PPU discount depends upon the actual issuer of the credit card.

> The prior art cited does not perform such a function and there is no hint whatsoever in the prior art that the PPU discount is dependent upon who the issuer of the credit card is….

> Hisey teaches that there can be a discount on fuel simply by using a credit card.  Certainly, if there is a PPU discount than [sic] there must be an amount set for that discount.  However, the claims now clearly recite that there can be multiple credit card issuers and that each issuer can have a different PPU discount if the issuer so desires.

['942 Prosecution History, Doc# 45-12, PageID# 2112-13].  Only after these amendments and arguments did the Examiner allow the claims.

Based upon this prosecution history, there can be no question that the claim language, as allowed and issued, requires multiple, different card issuers such that the amount of the discount awarded to a customer depends on which issuer's card is selected for payment.  The disputed claim language does not cover a system in which payment cards from only a single issuer are eligible for a discount on fuel.  Such a system was previously disclosed in the prior art Hisey article relied upon by the Examiner.  The applicant specifically amended claim 1 to distinguish over Hisey and, therefore, surrendered coverage over that subject matter.

> 2. **increasing customer use of a third-party financial card issued by a third-party issuer, wherein the third-party financial card is selected from a group consisting of different issuers of credit cards**

The above-quoted claim language appears in the preamble of independent claim 9 of the '942 patent. Claim 9 issued from application claim 11 in the '942 patent application. Application claim 11, like claim 1, was specifically amended to recite multiple issuers in an effort to distinguish over the prior art Hisey article cited by the Examiner. Although the language of claim 9, as issued, is different than the language of claim 1, the applicant made the same patentability arguments during prosecution with respect to both. Kroger, therefore, contends that the disputed claim language should be construed in the same manner as the preamble of claim 1 to mean "**increasing use of multiple, different payment cards issued to customers by multiple, different issuers that are unrelated to the fuel merchant**."

As originally filed, the preamble of application claim 11 lacked any recitation of multiple card issuers. ['942 Prosecution History, Doc# 45-15, PageID# 2465]. Claim 11, like claim 1, was rejected by the Examiner in view of the Hisey prior art article. ['942 Prosecution History, Doc# 45-15, PageID# 2434-35]. In response, the applicant amended the preamble of application claim 11 as follows:

> A system for discounting a price-per-unit (PPU) of fuel at a fuel merchant and increasing customer use of a third-party financial card issued by a third-party issuer, wherein the third-party financial card is selected from a group consisting of <u>different issuers of</u> credit cards ~~and debit cards~~, said system comprising:

['942 Prosecution History, Doc# 45-12, PageID# 2110]. In addition, the applicant contemporaneously argued:

> Claims 1 and 11 have been amended to make it perfectly clear that there can be multiple credit card issuers and each issuer can have an independent PPU discount…. Thus, as amended, all of the claims now recite more clearly that the amount of a discount that a customer receives for fuel is dependent upon the issuer of a credit facility.

[*Id*. at PageID # 2112-13].  Based upon this prosecution history, it is clear that issued claim 9 of the '942 patent requires multiple, different card issuers to the same extent as issued claim 1.

### 3.    associating the identified third-party issuer of the financial card with the stored PPU discount for fuel

The disputed claim language, which appears in both independent claims 1 and 9 of the '942 patent, must be construed in a manner consistent with the requirement that each of the multiple issuers has its own respective PPU discount that is specific to that issuer.  The specification of the '942 patents states that first the BIN range on a customer's card is used to "identify the card issuer."  ['942 Patent, Doc# 45-11, col 4, ln 41-42,  col 4, ln 67- col 5, ln 4].  The card issuer ID is then used to access a relationship database and retrieve an associated PPU discount for the issuer.  [*Id*. at col 5, ln 4-6].  Kroger contends that the claim language means "**associating the identity of the third-party financial card issuer with the stored price per unit reduction in a specified monetary amount to which the customer is entitled for using the third-party issuer's financial card, where the third party issuer is unrelated to the fuel merchant**."  This construction is consistent with the Examiner's stated reasons for allowance. ['942 Prosecution History, Doc# 45-12, PageID# 2009].

## X.  CONCLUSION

Kroger contends that its proposed claim constructions should be adopted by the Court.

Respectfully submitted,

*/s/ Jeffrey C. Metzcar*
Jeffrey C. Metzcar (0072648)
THOMPSON HINE LLP
Austin Landing 1
10050 Innovation Drive, Suite 400
Dayton, Ohio 45342-4934
Phone:  (937) 443-6841
Fax:  (937) 443-6635
Email:  Jeff.Metzcar@ThompsonHine.com

Stephen J. Butler (0010401)
Heather M. Hawkins (0078569)
THOMPSON HINE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202
Phone:  (513) 352-6700
Fax:  (513) 241-4771
Email: Steve.Butler@ThompsonHine.com
        Heather.Hawkins@ThompsonHine.com

Trial Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 27, 2011, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's Electronic Filing System.  Parties may access this filing through the Court's system.

*/s/ Jeffrey C. Metzcar*
Jeffrey C. Metzcar

673176.5